Law Office
JOHN A. YACOVELLE
8438 Mackall Rd.
St. Leonard, MD 20685
410-586-3344                           RETURNABLE 1/7/13
Attorney for Defendant
Matthew Durst

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

**JAKE BALL TRUST, STEVEN DURST,
and REUBEN DURST**
      **Plaintiffs**

                           **CIVIL ACTION**
           **v.**               **Case 1:12-cv-05255-JBS-JS**

**MATTHEW DURST,
      Defendant**

---

## BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

## ORAL ARGUMENT REQUESTED

1

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**                                              4

**STATEMENT OF FACTS**                                        6

**ARGUMENT**                                                 16

    **I. THE ISSUE OF THE FAIRNESS OF THE SETTLEMENT AND THE VALUE OF THE 1600 BUILDING HAVING BEEN LITIGATED BETWEEN THESE PARTIES AND HAVING BEEN DETERMINED AGAINST THESE PLAINTIFFS BY A COURT OF COMPETENT JURISDICTION AND HAVING RESULTED IN A FINAL JUDGMENT THAT WAS NECESSARY TO THE DECISION, RELITIGATION OF THAT ISSUE IS PRECLUDED BY COLLATERAL ESTOPPEL**

**CONCLUSION**                                               21

## TABLE OF CASES

**Alaska v. Andrus, 429 F.Supp. 958, 964 (D.Alaska 1977),**
**aff'd, 591 F.2d 537 (9th Cir. 1979**                    **20**

**Culver v. Insurance Co. of North America, 115 N.J. 451 (1989)** **21**

**Melikian v. Corradetti, 791 F.2d 274, 277 (3rd Cir. 1986).**    **16**

**MSKP Oak Grove, LLC v. Venuto, Civil Action No. 1—6465**   **16**
**(JBS/JS), D.NJ (June 20, 2012),**

**Local 322 Allied Industrial Workers v. Johnson Controls, Inc.,**
**924 F.2d 732 (7th Cir. 1991), cert. den. 500 U.S. 942 (1991).**    **20**

**Ross v. Ross, 308 N.J. Super. 132, 148 (App.Div. 1998).**    **20**

## **INTRODUCTION**

Plaintiffs are two brothers who are suing their brother Matthew for his alleged, and denied, mishandling of certain aspects of the "Jake Ball Trust" (the "Trust" hereinafter).   The oldest brother, Steven, has always been identified as the Settlor/Grantor of the Trust, though he has now claimed that, all along, he has also been a Trustee of the Trust and seeks to amend the complaint (motion returnable on 1/15/13) to assume that status. Whatever he turns out to be, he has had his hands in all Trust business and affairs from inception, in 2004, right up to the present.

The other plaintiff, Reuben, aka "Mike", has been a Trustee, like Matthew, since the beginning.  One difference between them is that Matthew has actually been a working Trustee, handling investments (with notable success), responding to continuous cries for money from certain beneficiaries, dealing with the Trust attorney in Connecticut, filing forms and reports, maintaining records, and generally administering the Trust in all respects.   As for Reuben, he has been described in various filings, not unfairly, as "inactive', even "inert", having eschewed any participation in Trust affairs—other than borrowing Trust money through straw parties-- since at least December 2006. "Inert", that is, until October 5, 2011, when brother Steve called him and he sprang into action to denounce a settlement about which he knew nothing other than what he was told by Steve. Reuben, incidentally, now sees himself as trying to protect "Steve's money", notwithstanding the fact that the Trust has been irrevocable since December 24, 2007, at which time the money was no longer "Steve's".

In any event, the Complaint in the case at bar, filed initially in the Chancery Division of Superior Court, Cumberland County, on May 17,

2012, focused on two major claimed areas of mismanagement by Matthew: the first, involving alleged misappropriation, self-dealing, and other violations of his Trustee responsibilities (see paragraphs 12, 13, 16, 17 and 18 of the complaint) are not a part of this Motion because they are before a Connecticut court which is considering whether those claims, which are contested, do or do not have merit. That proceeding, an Accounting in which the present plaintiffs have appeared through counsel and personally, is now before that court for decision.

The second major category of alleged mismanagement relates to the settlement by Matthew of a lawsuit he had filed on behalf of the Trust to have a provision in the Operating Agreement of Goodmill, LLC as well as a Surety and Pledge Agreement, declared unenforceable. The allegations concerning settlement of this suit are contained in paragraphs 14, 15, 19, 20 and 24 of the Complaint. The settlement in question is variously described as "ill-conceived", and "ridiculous", apt descriptions if there were any truth whatsoever to plaintiffs' description of the terms, which there is not.

Most importantly, these plaintiffs have already had their "bite at the apple" and have failed completely to prove that the settlement was unfair or unreasonable. Hence, this Motion to have all settlement-related allegations removed from this case because relitigation of those issues is precluded by collateral estoppel.[1]

---

[1] Plaintiffs propose to file an Amended Complaint, motion for which is set for January 15 before this Court. Though the numbering has changed, paragraphs 22, 23, 25, 27, 28, and 32 of the Amended Complaint relate to the same issues briefed herein.

5

## STATEMENT OF FACTS

### Background facts developed during previous litigation and believed to be noncontroversial:

This entire chain of events began in 2004 when Steven Durst, then employed in the commercial real estate operation of Bruce Goodman, created a Trust which he named the "Jake Ball Trust". His purpose was to place certain interests which he had earned, or was soon likely to earn, directly into the Trust for the benefit of his several children and the children of his siblings. Among the siblings were brothers Matthew and Reuben, both of whom he named as Trustees. Under the original Trust Agreement, Steven had full authority to do anything, including removal and replacement of Trustees, changing the terms of the Trust, and taking such money out of it as he saw fit. All of that changed on Christmas Eve, 2007, when he executed a new Trust Agreement which rendered the Trust irrevocable and beyond his ability to change it. The named Trustees remained Matt and "Mike" (a name often used by Reuben), although Mike had taken no active part in Trust affairs and had left matters in Matt's hands since at least December 2006. Whether or not Steve, himself, was also a Trustee, then and now, is left for another day.

Between 2005 and 2007, the Trust was involved in three separate transactions with Steve's employer, Bruce Goodman, a commercial real estate developer in Jenkintown, PA. A brief review of these matters is essential to understanding the issues presently before the Court.

**A. The shopping center (Goodmill):** The earliest, which occurred on November 15, 2005, was receipt of a 10% membership interest in Goodmill, LLC, owner of a Millville Shopping Center, on which Steve

6

Durst had performed substantial services for which he had earned sizable fees as well as the membership interest. Steve directed the Goodman people to place that interest in the Trust, in the name of "Matthew Durst, Trustee of the Jake Ball Trust". Unfortunately, the Operating Agreement of Goodmill LLC contained a provision, Sec. 7.04, which gave Goodman the option to purchase the 10% interest in the event Steve Durst's employment with him ended. The purchase formula was such that the 10% interest would be "purchased" for no money for several years into the future. After Steve was terminated from employment with Goodman, on May 28, 2010, he claimed he had never read the Agreement and, basically, that the buy-out had been slipped past him. On the other hand, discovery revealed that 3 ostensibly reputable witnesses were prepared to testify that Steve knew of the provision and had actually negotiated changes in the formula. The enforceability of Section 7.04 was one of the issues in the case, filed by Matthew in August, 2010, which we came to Woodbury on October 3, 2011, prepared to try. (**Matthew Durst, Trustee v. Goodmill, LLC et.al., Docket No. C-27-10).** The other issue involved enforceability of a Surety and Pledge Agreement which the Trust had entered into in connection with transaction "C", *infra*. While ready to try it, we were also well-motivated to settle the case, particularly because the clause 7.04 was written in plain English, Steve was said to be a sophisticated real estate person, and the 3 adverse witnesses were not easily dismissed. All in all, we were confronted with an uphill battle on the 7.04 issue, though that was not the case on the Pledge Agreement issue.

What was the **value** of the Trust interest in Goodmill as of October 2011? On December 21, 2007, in an Agreement leading to the Trust

becoming irrevocable, Steve Durst declared that the 10% interest was worth $600,000 "as per the attached appraisal", though there was none attached.

Later on, one Paul Ruby of Parker Benjamin, Inc. of Farmington, CT, issued an appraisal dated May 19, 2008, valuing the 10% Goodmill interest at $841,000. Although it was clear from his appraisal that he had seen the Operating Agreement, which he quoted, he had not flagged Section 7.04 and had not either attempted to explain it away, or discount his appraisal because of it. Assuming, for present purposes that might have amounted to negligence, no action was taken against Ruby by the Trust because his appraisal was issued <u>after</u> the Operating Agreement had been signed (Nov. 2005) and <u>after</u> the Trust had issued a $500,000 note to Steve on December 24, 2007, (based on Steve's $600,000 valuation) and the appraisal influenced neither action because it did not yet exist. Although no suit was filed against Ruby because of the proximate cause issue, those most closely involved with the case, including Steve, knew better than to put much stock in the $841,000 number. To put it simply, would anyone pay $841,000 for the 10% interest if they were aware of Section 7.04 and the fact that Goodman was very well -equipped to litigate its validity and enforceability?

By the time the Goodmill case was listed for trial and Mediation on October 3, 2012, my client and I estimated the settlement dollar value of that claim as $250-350,000, taking into account Steve's initial $600,000 valuation, the estimate that the chances of winning were at most in the 50% range, and the fact that a major tenant, Circuit City, had recently gone bankrupt and left the Center with a large vacancy.

**B. The Reserve:**

The second transaction involving the Trust and Bruce Goodman involved a property known as The Reserve at Union Lake. This was a 30+-

acre parcel of raw land in Millville.   Under the terms of an Operating Agreement dated January 26, 2007, the Trust became a 10% member of the LLC thereby created (later corrected to 20%).   Again, the interest was earned by Steve Durst for services rendered in connection with the property.   The only party identified as holding the membership interest of the Jake Ball Trust was "Matthew Durst, Trustee of the Jake Ball Trust". The Reserve contained a buy-out provision similar to the Goodmill buyout, but certain numbers had not been filled in and it was, in my opinion, unenforceable.   No effort had been made by anyone to enforce it as the mediation commenced.   It was not in play in our case.   Yet Steve, participating as either a Grantor or undisclosed Trustee, or both,[2] made the announcement early in the Mediation that the value of the Trust interest was agreed at $245,000 and he proposed to transfer that interest to Goodman as part of a settlement.   This offer, which had not been discussed with either my client or me ahead of time, turned out to be part of a package—Steve was not interested in being involved with Goodman anymore, (the feeling was mutual), and so he proposed to give Goodman the interest in the Reserve, the interest in Goodmill and the building at 1600 West Hunting Park (see "C" *infra*), in exchange for cancellation of the mortgage liability on 1600 and substantial cash—something in the $650,000 range.   This figure gained no traction with either the defendants or the mediator, and by the end of October 3, discussion was in the $250,000 range.

### C. 1600 West Hunting Park Boulevard:

---

[2] As a Trustee, which he now claims to be, Steve would have had a right to be in the Mediation.  As a Grantor, he would not have been there as a matter of right. Since he was our only witness, however, having him ejected was not an option.

The third deal between the Trust and Goodman involved a property located at 1600 W. Hunting Park Boulevard in Philadelphia (referred to hereinafter as "1600 Building" or simply "1600"). This building, 70,000 square feet and about 70 years old, had been located by Steve Durst who had, at the time, neither money nor credit. Since he wanted the building, he turned to Goodman to loan him over $1 million dollars so that he could buy it. Closing occurred in June, 2007, and the title was placed in a Limited Partnership named "Zach & Jack Realty Associates LP", which was owned 99% by the Jake Ball Trust and 1% by the General Partner, 1600 GP, controlled by Goodman. Steve handled the checkbook and managed the property, but the Trust guaranteed the loan, which was due and payable in full by June 30, 2010, at which time it was unpaid and went into default. The Trust guarantees took the form of a Surety Agreement, a Pledge of the Trust ownership in Goodmill and a confession of judgment on the note, all documents signed by Matthew before a notary in Connecticut and handed over to Steve at a turnpike rest stop in the middle of the night before the settlement. Ultimately, the Trust had to engage Pennsylvania counsel to stave off execution on the confessed judgment and to hold off the foreclosure, which cost the Trust approximately $60,000 in legal fees. By the time of the Goodmill mediation, Pennsylvania counsel had made it clear to Matthew that matters could not be held off much longer. Finally, as part of the **Goodmill** case we also had to contend with litigating the enforceability of the Pledge Agreement, another way in which the 10% interest could have been lost summarily, in addition to the section 7.04 buyout provision.

The 1600 building was not a pleaded part of our case. Steve Durst, in the mediation, absolutely insisted—despite all attempts to cut him off—on

injecting 1600 West Hunting Park into the discussion. It was not really something we wanted to discuss very much, since Goodman's statement of the amount then due was over $1.3 million dollars and the deed for the real estate portion of the transaction recited consideration paid of $451,000. (The balance of the price was for "purchase of business assets"). Moreover, as far as we could determine pretty much on the spot, no one was collecting any rent anymore. Beyond that, by late 2010 the building was not habitable and the only estimate ever produced to bring it up to code was $259,100. (by an architect friendly with both Goodman and Steve—who, of course, said it was "too high" but produced no contrary estimate). All in all, Goodman was probably high when he took the position in the mediation that one would be  "lucky to get $600,000" for the building today. The deficiency which would have resulted from litigating to a conclusion in that case would have, in my opinion and that of my client, wiped out the Trust entirely even if we won the Goodmill case.

**Facts of the current matter:**

In the underlying case, **Matthew Durst, Trustee of the Jake Ball Trust v. Goodmill, LLC and Bruce Goodman, Docket No C-27-10,** filed in the Superior Court, Chancery Division, Cumberland County in August 2010, I represented the plaintiff.  The defendants were represented by Stephen Hladik, Esq. and David Onorato, Esq. Following completion of discovery, all appeared for trial and a simultaneously-scheduled Mediation on October 3, 2011.  At the mediation, conducted by court-appointed mediator John Kerns, Esq., there was little discussion of the value of the Goodmill interest or the Reserve.  There was some dispute about the total amount claimed to be due on the 1600 loan, then claimed to be $1.3 million,

11

but counsel fees, though claimed as allowed under the documents, appeared to be excessive as compared to actual services.

The significant issue that arose out of the Mediation involved the value of the 1600 Building, because on that turned the question of whether, as soon as Pennsylvania counsel could no longer hold it off, foreclosure would be completed and a deficiency entered against the Trust. (JAY aff. par. 8). My client and I, in the belief that Goodman's $600,000 dollar value was much more accurate than Steve's claim that the building was worth more than the claimed indebtedness on that date of $1.3 million, settled the case. Steve, though participating through the October 3 session, did not participate on the 4th and absented himself. The settlement, originally "confidential", involved exchanging the Goodmill 10% interest, (valued by us at $250 to $350,000) the Reserve 20% interest (agreed at $245,000) and the 1600 Building ($600,000) for release of the indebtedness of the Trust on the 1600 Loan ($1.3 million), payment to the Trust of $80,000, and reservation of the right of the Trust to proceed with a malpractice claim against two Pennsylvania attorneys, deemed by Steve to be an absolute requirement (JAY aff. par.9). The judge entered an Order on October 4, marking the case settled (Exhibit A).

Trustee Mike surfaced within days, and along with four of Steve's adult children, objected to the Settlement. On October 31, Mr. D'Elia announced his representation of the current plaintiffs and requested information on the case so he could decide whether or not to become involved. All requested information was in his hands by November 6, and nothing further was requested by him. (JAY aff. par.11)

With no activity forthcoming from Mr. D'Elia, Stephen Hladik, representing the defendants, moved on December 13 for enforcement of the

settlement. (JAY aff. par. 12). On December 14, I filed a Certification disputing the form of some of the proposed closing documents, but otherwise supporting the settlement. (JAY aff. par. 13).

Finally, on December 28, nearly three months after the settlement, Mr. Delia filed a motion on behalf of Steve who may or may not have been a Trustee, but was not identified as one, and Mike, who was a Trustee, to Intervene and to have the settlement vacated and the matter listed for trial. The Motion placed in issue whether the settlement was fair, which depended on the value of the 1600 Building. Steve Durst clearly knew the significance of the issue since, in his certification, he pointed out that a substantial deficiency would occur if the building was worth as little as $600,000. Since he knew the rental history of the property (discussed *infra*) and how that would impact on any appraisal, he elected instead to propose valuation of 1600 on the basis of a couple of offers in the 2010 timeframe which never resulted in settlements. (JAY aff. par 15; Exhibit D). The court set all pending Motions for January 6, 2012.

On January 6, rather than have argument on the Motions, Judge McDonnell held a conference with Messrs. Hladik, Onorato, D'Elia and myself in which she indicated that the primary issue was the value of the 1600 Building and that the papers filed so far left her with questions as to that value. Accordingly, she entered a Case Management Order giving all parties, including the proposed Intervenors, the right to propound Interrogatories and document requests, as well as the right to serve expert reports by March 15 (by the Intervenors) with responsive reports to be served by April 15. Finally, all parties had the right to file supplemental certifications and briefs by April 21, and all motions were adjourned to April 26. (JAY aff. par. 17, Exhibit F).

13

All parties served and answered Interrogatories and some document requests. (JAY aff. pars 18-20, Exhibits G &H), and Steve Durst, who had been the exclusive manager of the 1600 Building, when asked in Interrogatories about rent collected between 2008 and 2011 answered that "approximately $42,000" was collected in 2009 and approximately $33,000 was collected in 2010. No figures were supplied for any period thereafter. He also estimated total expenses of $152,500 over the period, a figure which obviously exceeded all rent that has been accounted for. (Exhibit G).

On February 6, 2012, I received a signed Agreement of Sale from Mr. Hladik. It appeared that a buyer procured by Steve Durst had signed the Agreement to purchase 1600 for $1.1 million, "as is, where is"—in other words the buyer was not worried about the $259,000 it would cost to make the building habitable---but with a period to conduct due diligence and to terminate the agreement for various reasons. When I inquired of Mr. D'Elia whether he thought it was a good idea to seek a continuance of the motions to see whether or not the sale actually closed, he did not respond but left the response to Steve Durst. The latter said in no uncertain terms that whether it closed or not was "irrelevant". Only the fact of this and previous offers was relevant, according to him. (JAY aff. par 21, Exhibit I).

On March 27 I filed a Certification and Brief arguing against enforcement of the settlement if the $1.1 million sale closed, on the ground that to enforce it would result in a $500,000 windfall for Goodman who was both a lender and a fiduciary (as the General Partner of Zack & Jack, LP). No sooner had the ink dried on those papers than the buyer allegedly took a closer look at the 1600 building and terminated the agreement of sale because the building was in worse condition than previously thought,

14

whereupon we reverted to our original position of supporting enforcement of the settlement. (JAY aff. par. 22.)

Other matters presented to the court in a late flurry of motions were Mr. D'Elia's motion for "various relief", particularly to take the deposition of my client (a Connecticut resident), in New Jersey on matters relating to a pending Connecticut Accounting, to remove him as a Trustee, and to remove me as his attorney; Mr. Hladik opposed that motion and reiterated that 1600 was worth $600,000, that no contradictory expert report had been received and that the settlement should be enforced; and rounding out the picture, was my motion for a protective order on Matt's proposed Accounting deposition,[3] opposition to Matt's removal and to mine as well, and, in view of the termination of the $1.1 million "sale", a return to my support of enforcement of the settlement. (JAY aff. pars 23-26).

Argument on the motions took place on April 26. (The transcript is Exhibit L and the argument is discussed *infra* in Argument, Point I). In a post-argument conference, the judge solicited more evidence on the value of 1600. Only the defendants responded. The Intervenors submitted nothing. On June 27, the court entered a final order enforcing the settlement on the ground that the proposed Intervenors had produced no proof that 1600 had been undervalued or that the settlement was a "bad deal" for the Trust. The Intervenors responded with a dual-pronged attack on the decision: they filed an abortive appeal in the Appellate Division

---

[3] Although the Case Management Order had not provided for depositions, I wrote Mr. D'Elia that I would agree to Matt's deposition on the issues before the N.J. court, but not on a proceeding going on in Connecticut with an 80-page accounting filed, and several court appearances in which I was not involved. Evidently, he was not interested and his client certified that he and Mr. D'Elia would journey to Connecticut and take the deposition which, of course, they did not do.

which they later dismissed; and in a last desperate attempt to get yet another bite, they filed this suit in the Superior Court which was subsequently removed to this court.

## ARGUMENT

**I. THE ISSUE OF THE FAIRNESS OF THE SETTLEMENT AND THE VALUE OF THE 1600 BUILDING HAVING BEEN LITIGATED BETWEEN THESE PARTIES AND HAVING BEEN DETERMINED AGAINST THESE PLAINTIFFS BY A COURT OF COMPETENT JURISDICTION AND HAVING RESULTED IN A FINAL JUDGMENT THAT WAS NECESSARY TO THE DECISION, RELITIGATION OF THAT ISSUE IS PRECLUDED BY COLLATERAL ESTOPPEL.**

It is generally held that in suits based upon diversity jurisdiction the relevant law of res judicata and collateral estoppel is the law of the forum— New Jersey. **Melikian v. Corradetti, 791 F.2d 274, 277 (3rd Cir. 1986).** The court went on to say that "Collateral estoppel precludes the relitigation of an issue that has been put in issue and directly determined adversely to the party against whom the estoppel is asserted." **Ibid.**

This Court has had recent occasion to break down that general statement into five elements. In **MSKP Oak Grove, LLC v. Venuto, Civil Action No. 1—6465 (JBS/JS), D.NJ (June 20, 2012),** New Jersey law was described as requiring the moving party to demonstrate the following:

> "(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to, the earlier proceeding."

It is submitted that the present motion succeeds on all counts.

It is clear that these plaintiffs are presently claiming that the settlement of the Goodmill case was unfair, ill-advised, and involved ridiculously disproportionate consideration. That is exactly what the proposed Intervenors, as these plaintiffs were then called, claimed in the Superior Court **Goodmill** case. In their very first filing, a motion returnable January 6, those parties recognized (par. 42, S. Durst Certification, Exhibit D) that the Trust would be liable for a deficiency if the 1600 building was worth $600,000, the figure used at the Mediation.

Durst went on to say that there "could be no deficiency", (par. 43) because the building was worth much more than $600,000. Indeed, he claimed that the building was worth more than the mortgage balance (then claimed by the lender to exceed $1.3 million) (par. 46). As evidence, this sophisticated real estate person lists certain proposed "offers", sometimes more than once, not one of which ever got anywhere near a settlement table (pars 43-47). That is what he valued 1600 then, and that is what he has maintained throughout.

In response, we filed a Letter Brief and Certification on January 2 (Exhibit E), (in which we did not oppose Intervention, and stated clearly that the interests of my Trustee and Mr. D'Elia's clients were adverse. (Letter Brief, p. 2-3). I concluded (p.9) that the issue before the court was whether the settlement was fair and reasonable, something that could be decided on papers or at a hearing. As it happened, these plaintiffs never made a sufficient showing to rise to the "hearing" level and the decision was ultimately made on the papers.

On January 6, the return date of the various motions, Judge McDonnell conducted a conference with all counsel.   The judge came swiftly to the point which was that she was uncertain on the pivotal matter of the value of the 1600 building based on what she had seen so far. Accordingly, she entered a Case Management Order that day, Exhibit F, which gave all parties the right to serve Interrogatories and document requests by January 26 with responses due by March 1; gave the "Potential Intervenors" the right to serve any expert reports by March 15, with responsive expert reports, if any, to be served by April 15; and adjourned all pending motions to April 26, 2012.   All parties were given leave to serve supplemental certifications and briefs by April 21, and all did so. And while the *de facto* Intervenors did not get the automatic right to take depositions on the valuation issue, they never asked for the right and never wanted to take such depositions even though I was agreeable to that procedure.   Instead they wanted to depose my client concerning the Connecticut Accounting, and when I would not agree to it, Steve Durst said in a certification that they would "drive to Connecticut" to take the deposition, which they had a right to do, but they failed to follow through. (JAY aff. par. 27).

Although Interrogatories and documents were exchanged by the parties, as well as subsequent certifications and briefs, these plaintiffs produced no expert reports whatsoever.  They continued to rely on the same shopworn claims of Steve Durst that some obviously-waterlogged offers had determined the value of 1600. (JAY aff. par 27).

To top it all off, Mr. D'Elia appeared on April 26, a date fixed back on January 6 for these motions to be heard---motions, including his own, which had been pending since last December---and announced that "I did not actually prepare to come and argue today" (Exhibit L, p.15 l. 25) though he

18

did say a few words about the settlement since "we were all there". Here is his entire statement regarding the value of 1600:

> "And, number 3, we're not just dealing with Mr. Durst. [An apparent reference to Steve Durst's "valuations".] <u>They're right. I didn't get an appraisal.  If I had it to do over again, I would have spent that money.</u>  But, we have—in the pleadings, you have offers over the last several years in the million to as much as an offer by Mr. Goodman himself to finance $2 million for this property.  So, we're not all that worried about the value of this property.  We believe because of what the market is telling us that the property is worth in the vicinity of $1.1 million, $1.2 million.  And we believe that firmly." (Tr. 17-7). (Emphasis added).

This effort was so feeble that the judge, who had started the hearing by giving her "tentative inclination" to vacate the settlement, apparently reconsidered.  The judge said in a subsequent chambers conference that she would receive additional information regarding value while she was preparing her decision.  And with one more chance, these plaintiffs still failed to provide anything!  The only thing that was filed was Exhibit M, by the defendants, Pennington's opinion that the building was worth between $500,000 and $600,000.[4]

Ultimately, the judge decided to enforce the settlement because no proof was submitted by the Intervenors that the 1600 Building had been undervalued.  (Exhibit N, bench memo p.4).  Nor was there any proof that the settlement was a bad deal for the Trust.  As the court concluded, though

---

[4] Not that it makes a difference, but the failure may not have been due solely to Steve Durst's obstinacy.  It may be that they could not possibly locate an appraiser who would have placed the necessary value on an old 70,000 square foot rental property with total rental income of $42,000 in 2009, $33,000 in 2010 and nothing since  (JAY aff. par.18, Exhibit G).

the intervenors are unhappy with the settlement, "in the absence of proofs, their unhappiness does not warrant setting aside the settlement".

The Intervenors filed an appeal to the Appellate Division (Exhibit O), failed to obtain emergent stays from either the trial court or the appellate court, and, predictably, abandoned their appeal which was subsequently dismissed (Exhibit P). The Intervenors-Plaintiffs have received the benefits of the settlement, $80,000 and discharge of the Mortgage on the 1600 Building, on which the Trust owed somewhere in excess of $1.4 million dollars.

When we hold these events side by side with Your Honor's **MSKP** criteria it is clear that a) the issue of the fairness of the settlement, as based ultimately on the value of the 1600 Building, is identical in both cases; and b) that the issue was actually litigated in the prior proceeding.   Whether these plaintiffs were "Intervenors", "proposed Intervenors" or "*de facto* Intervenors is of no moment.  The question is whether they were <u>treated</u> as intervenors "and fully participated [on the motions], whether or not the order pinned an appropriate label on [them]".   **Ross v. Ross, 308 N.J. Super. 132, 148 (App.Div. 1998).**   Indeed, the **Ross** court cited cases holding that intervention as late as an appeal was sufficient to require application of the bar to subsequent litigation. **See, Alaska v. Andrus, 429 F.Supp. 958, 964 (D.Alaska 1977), aff'd, 591 F.2d 537 (9th Cir. 1979; Local 322 Allied Industrial Workers v. Johnson Controls, Inc., 924 F.2d 732 (7th Cir. 1991), cert. den. 500 U.S. 942 (1991).**

Returning to the elements, c) the court clearly issued a final judgment on the merits.   There is simply no other reasonable interpretation of the decision.  The fact that it came up on cross-motions to enforce or vacate a settlement agreement has no significance.  **See, e.g., Culver v. Insurance**

**Co. of North America, 115 N.J. 451 (1989),** involving a post-settlement supplemental proceeding with cross-motions.  Next, (d) the determination of the issue was essential to the prior judgment; had the issue been determined otherwise, the settlement would have been vacated rather than enforced. Finally, the parties against whom the doctrine is asserted were parties in the prior suit, as they are in the instant case. .  At least one of them, and perhaps both, were Trustees of the Jake Ball Trust and represented the beneficiaries as real parties in interest in that case, as in this one.

## CONCLUSION

For the foregoing reasons, which are respectfully submitted, this Court is urged to grant this Motion for Partial Summary Judgment and dismiss, with prejudice, any claims by the plaintiffs that the settlement of the **Goodmill** litigation was unfair, unreasonable, or caused damage or loss to these plaintiffs, on the ground that the plaintiffs are collaterally estopped from asserting such claims.

JOHN A. YACOVELLE
Attorney for Defendant
8438 Mackall Rd.
St. Leonard, MD 20685

yacovelle@yahoo.com
phone or fax, 1-888-819-3736
phone 410-586-3344