**The D'Elia Law Firm, LLC**
By: Vincent D'Elia, Esquire
601 Route 73 North, Suite 300
Marlton, New Jersey 08053
Phone (856) 797-9777
Fax     (856) 797-1447
e-mail: delia@delialawfirm.com
Attorneys for Plaintiffs, Jake Ball Trust, Steven Durst and Reuben Durst

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

Reuben Durst, Trustee, Steven Durst,
individually and as Trustee

                        Plaintiff

            v.

Matthew Durst, individually and as Trustee,
Halloran & Sage, LLP, Robinson & Cole,
LLP and Kelley Galica-Peck

                        Defendants

**CIVIL ACTION**
No. 1:12-cv-05255-JBS-AMD

## CERTIFICATION OF STEVEN DURST IN SUPPORT OF MOTION TO RECONSIDER:

1. **DENIAL OF A MOTION TO AMEND COMPLAINT TO JOIN ADDITIONAL DEFENDANTS**

2. **GRANTING OF MOTION FOR SUMMARY JUDGMENT FOR DEFENDANTS ROBINSON & COLE**

3. **GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF MATTHEW DURST**

4. **DENYING MOTION TO AMEND COMPLAINT TO JOIN JOHN YACOVELLE, ESQUIRE AS A DEFENDANT**

I, Steven Durst, being of full age, hereby certify as follows:

1.      I am a Plaintiff in the above-captioned matter and, as such, am fully familiar with the facts herein.

2.     I respectfully submit that denial of this Motion to Reconsider will result in a manifest injustice and the Defendants will be permitted to benefit from their own wrongdoing. In addition, I further respectfully submit that additional information secured during the recent discovery will disclose specific new facts and information that justify reconsideration.

3.     The recently concluded deposition of Defendant Kelley Peck, Esquire makes it abundantly clear that her misrepresentation (during the time she was an employee of Robinson & Cole) to me (her client) intentionally caused the delay in the filing of the claim against the appraisal company Parker Benjamin and the appraiser Paul Ruby (hereinafter collectively referred to as "Parker Benjamin").

## FACTUAL BACKGROUND:  RECONSIDERATION OF MOTIONS REGARDING PARKER BENJAMIN AND ROBINSON & COLE

4.     Prior to December 2007, I was the Grantor under the revocable Jake Ball Trust (hereinafter "Trust"). In or about December 2007, the Trust was in the process of being amended to make it irrevocable.

5.     Defendant Kelley Peck was an attorney with Halloran & Sage, LLP at the time that the Trust was converted from revocable to irrevocable. She prepared the amended Trust documents which included the Trust's acquisition of a 10% interest in Union Lake Crossing, a 526,000 square foot regional shopping center in Millville, New Jersey, that I had earned as project manager.

6.     In exchange for the 10% interest aforesaid, I received a promissory note for $500,000.00 with interest at 4.79% secured by the 10% interest in Union Lake.

2

7.      Before executing the irrevocable Trust amendment, Kelley Peck required an appraisal of the 10% interest.  She hired Parker Benjamin, whom she had done business with in the past.

8.      Critical to understanding the nature of my claim against Kelley Peck, Halloran & Sage and Robinson & Cole is a clear understanding of when Kelley Peck had the appraisal by Parker Benjamin.

9.      Prior to execution of the December 2007 Irrevocable Trust documents, Kelley Peck made it abundantly clear that the documents would not be executed until the Parker Benjamin appraisal was in hand, in order to satisfy IRS Requirements.

10.     This position was corroborated by her own email which confirmed that the December 2007 Irrevocable Trust documents would wait until she got the appraisal from Parker Benjamin.  She confirmed this in an email in which she estimated that the appraisal would be in her hands within two weeks from October 25, 2007.  In fact, The Irrevocable Trust documents were signed on December 21, 2007.

11.     In her October 25, 2007 email (Exhibit "A"), Ms. Peck states:

> ...I want to explore the possibility of delaying signing until we receive the appraisal. I spoke to Paul Ruby and he is willing to do the appraisal and will have it for us in about two weeks." To do so he will need the Operating Agreement and the Appraisal both of which I have and can give him...

12.     In preparation for the appraisal, both Kelly Peck and Parker Benjamin reviewed the Operating Agreement of the Union Lake Crossing as such a review was critical to determining the value of the 10% interest.

13.    Both Kelly Peck and Parker Benjamin have acknowledged reviewing the Operating Agreement but negligently failed to take into account the provisions of Paragraph 7.04(a) of the Operating Agreement:

> In the event that either Steven Durst or Christopher Anderson ceases to be employed by Goodman Management LLC for any reason whatsoever (hereinafter referred to as "Former Employee"), then Bruce A. Goodman shall have the option to purchase the entire Membership Interest of the Former Employee (the interest of Matthew durst, Trustee under the Jake Ball Trust Agreement in the event that Steven Durst ceases to be employed by Goodman Management, LLC) at a price equal to the "Net Operating Income" of the Property (for the preceding calendar year) divided by .09, less all debts, obligations and mortgages of the Company (including but not limited to the outstanding balance due under the Goodman Loans) times the Percentage Interest of the Membership Interest held by the former Employee. "Net Operating Income" shall mean annual rents received during the preceding calendar year less annual unreimbursed operating and capital expenses and repairs, professional fees and management fees incurred during the preceding calendar year. The Net Operating Income shall be determined by the accountants regularly engaged by the Company. The annual Net Income distributions to Former Employee, shall be prorated as of the date of closing on the sale of the Former Employee's Membership Interest. (See Exhibit "B")

14.    The enormous significance of Section 7.04(a) is obvious.    If my employment with Goodman was terminated, the cap rate provided in paragraph 7.04(a) would render the 10% interest as worthless.

15.    When made aware of this issue, I instructed Trust attorneys Yacovelle and Peck to start suit against the Parker Benjamin. This is confirmed in Kelly Peck's sworn deposition testimony (Exhibit "C", 43 at 18-23).

> Q:     Did there come a time when you had a conversation
> with    Matt, Steve or Mr. Yacovelle concerning a potential
> claim   against Parker Benjamin?

A.    Yes, there was Matt - - Matt did tell me that Steve wanted to sue Parker Benjamin.

16.    At the time I requested institution of the lawsuit against the appraiser, Kelley Peck was an employee of Robinson & Cole (previously dismissed as a Defendant by this Court). Kelley Peck and Robinson & Cole took the position that since the appraisal was not issued until approximately six months after the execution of the Trust amendment (making the Trust irrevocable) no claim against the appraiser could be pursued.

17.    This position taken by Kelly Peck/Robinson & Cole, is confirmed in an email from John Yacovelle relating to his discussion with Kelley Peck and Ed Heath (both of Robinson & Cole). In his June 18, 2011 email (Exhibit "D"), Mr. Yacovelle states:

> There are two potential areas of damages: the first is that the Trust, when it issued a $500K Note to Steve, could have been wasting money on a property of little value (the portion of the valuation attributable to Goodmill). Kelley Peck and Ed Heath called me on Thursday the 16th and he pretty much demolished that potential claim. He said that the agreement with Steve used the figure $900K as the estimated value of the Goodmill interest, a figure he said came from Steve. Regardless of where it came from, the agreement was finalized December 2007, several months before the draft appraisal let alone the final appraisal. Therefore, you could not have relied on the appraisal valuation of $841K in the agreement with Steve. In other words, the damages on this theory were clearly not proximately caused by the appraiser's assumed negligence. I agree with that conclusion completely.

18.    No one could dispute the logic of this. One cannot say in December of one year that they relied upon a document that was not even available until May of the next year. Kelley Peck and the appraiser, however, had the appraisal in 2007 and did,

in fact, rely upon said appraisal in December 2007. This is confirmed by Peck in her recent deposition.

19.     On pages 38 to 39 of her deposition, Kelley Peck acknowledged that she had, in fact, received the appraisal from Parker Benjamin in December 2007 prior to the execution of the irrevocable Trust documents and the $500,000.00 promissory note to Steve Durst. So she acknowledged that she did rely upon the appraisal. Consider this sworn testimony of Kelley Peck at her deposition (38 at 23; 39 at 1):

> Q:     At the time [December 2007] that you prepared those documents, [amended Trust documents] you had information from Paul Ruby as to the value of the property?
>
> A:     I did.

20.     It is in that context that we must look at the conduct of both Kelley Peck and Robinson & Cole. Peck knew that she had relied upon the appraisal in December of 2007 when she amended the Trust documents and converted them from revocable to irrevocable. Yet when asked to pursue a claim against the appraiser, she (and Robinson & Cole's Ed Heath) took the position that they did not have the appraisal.

21.     And why would Peck and Robinson & Cole misrepresent the timeframe within which they knew the appraised value of the 10%? Why in her sworn testimony does Kelley Peck, as an employee of Robinson & Cole, acknowledge relying upon the appraisal yet in her unsworn opinion to her own clients she says the exact opposite?

22.     The answer is simple. Kelley Peck knew she was guilty of the same negligence as Parker Benjamin in that she failed to advise either Matt, Steve or Mike Durst of the enormous impact of paragraph 7.04(a). Rather than take the ethical mode and advise her clients, she chose a cover-up of her guilt.

23.    If Parker Benjamin was liable (as acknowledged by John Yacovelle), then Kelley Peck was likewise liable for negligence.  Robinson & Cole (Peck's employer at the time that she misrepresented her reliance on the appraisal) must likewise be held responsible for that cover up.

24.    Peck states in her deposition (28 at 7-14) (Exhibit "E"):

Q:    At the time you prepare the collateral assignment of LLC interest you already had a copy of the Goodmill LLC operating agreement, did you not?

A.    Yes

Q:    And you had reviewed it before writing the collateral assignment of limited liability?

A:    Yes

25.    Peck continues in her deposition (48 at 23-24; 49 at 5-7) (Exhibit "F"):

Q:    And what effect did 7.04 have on the valuation of the Goodmill LLC property?

A:    Well, I didn't do the valuation, so I am not sure of the exact scope of the impact that it had.

26.    Yet in her November 28, 2011 (Exhibit "G") letter to Probate Court, Peck states the exact opposite:

At the time the Trust became irrevocable in December 2007 the interest was valued at $841,000.  However, there is a clause in the LLC operating agreement that may render the interest worthless under certain circumstances

27.    If the appraiser missed 7.04 and/or ignored it then, according to John Yacovelle, Esquire, he is negligent.   Likewise, if the appraisal and Section 7.04 of the Operating Agreement was known to Kelley Peck prior to the signing of the December 2007 Irrevocable Trust Amendment, then she too was negligent.  In addition, there is

clear liability against Robinson & Cole for their participation in the cover up and in their failure to discharge their obligation to institute suit against Parker Benjamin when asked to do so by me (her client).

28.    Defendants Kelley Peck and Robinson & Cole cannot be allowed to benefit from their wrongdoing.  Their efforts to conceal and protect Parker Benjamin were self-serving and motivated by the avoidance of a lawsuit which was clearly actionable against them as well as Parker Benjamin.

29.    Hence, the reason so much time has lapsed since I implored Matthew Durst, John Yacovelle and Kelley Peck to sue the appraiser, a fact all have now acknowledged in the last 2 months in sworn depositions.  The reason is a clear and undeniable cover-up by Yacovelle, Heath, Peck, Matthew Durst and Robinson & Cole to escape the consequences of their negligence.

30.    Accordingly, it is appropriate to stop Halloran & Sage, Robinson & Cole and their attorneys from complaining about scheduling inconvenience brought about by their herein described breaches of duty and integrity and stop inhibiting the light of day from falling on those responsible.

31.    Ms. Peck's pattern (while employed by Robinson & Cole) of misrepresentation and shifting allegiance cannot be overlooked or underestimated. For example, after the ill-advised State Court Settlement in December 2011, Defendant Matthew Durst transferred $35,000.00 of Trust money to the Trust account of Robinson & Cole.

32.    The stated reason offered by Kelley Peck and Robinson & Cole for this misappropriation of $35,000.00 was to preserve Trust assets and to cover future expenses including legal fees and taxes.

33.    Kelley Peck and Robinson & Cole both clearly knew that the escrow for payment of taxes was bogus. Since this was a Grantor's Trust, there could be no taxes. A grantor Trust is not liable for payment of taxes.   Kelley Peck knew this and participated in the misappropriation anyway.

34.    As to "other expenses" it should be noted that if there are no bills or invoices presented, then the Trust does not have any expenses.  So despite the fact that for over a year and a half not one bill came in making a claim against the Trust, yet Kelley Peck and Robinson & Cole still insisted upon diverting the $35,000.00.

35.    The only legitimate basis for holding the $35,000.00 was to guaranty Peck and Robinson & Cole's legal fees and both Peck and Robinson & Cole did this knowing full well that they could easily pad their legal bills to the tune of $35,000.00 or more.

36.    This position is clearly corroborated by Ms. Peck's email (Exhibit "H") wherein she states:

> If they [the beneficiaries] intend to object, I will need to advise the court and I will advise Matt to reconsider his strategy.

37.    If the money were to be used to pay legitimate Trust taxes or expenses, there would not be any strategy to revise, just bills to pay.  There would be no taxes to pay as Peck knew since she set up the Trust as a Grantor Trust. On December 12, 2011, the same day, Matt Durst removed $35,000.00 of Trust money and put it in

Robinson & Cole Trust account not pursuant to any court order but to the "revised strategy", as advised by Kelley Peck.

38.     In the two years until the $35,000.00 was returned there were zero bills, zero taxes and zero legal expenses from the other 3 law firms Peck ardently endeavored to have share the misappropriated funds.  No other firm took the bait, and in the Connecticut Court May 24, 2013 order, Peck's $28,388.00 bill was reduced by the Court to $1,395.00.  It is clear that Ms. Peck wanted to put everyone on notice that if my children challenged the accounting she was going to pursue a "revised strategy."  It is clear that that quote "revised strategy" included misdirection and misappropriation of $35,000.00.

39.     The $35,000.00 was not in Robinson & Cole's escrow account pursuant to a court order.  It was frozen there by a court order at my request to prevent Robinson & Cole through Peck from paying herself the $28,000.00 bill she conjured up.  The Court by its order of May 24, 2013 rebuffed Peck's rationale and her bill as bogus.  I would urge the court to revisit Peck's email to Mr. D'Elia on December 12, 2011 to see if a fair reading of that email is whether "to advise Mr. D'Elia that my children thought there were irregularities in Trustee Matt's accounting, or was it to threaten a revised strategy" in the words of Ms. Peck.

40.     This Court, in its opinion of January 13, 2015, says Plaintiff has failed to comply with Rule 56D specifically:

1.     What information is sought;

2.     How if uncovered it would preclude summary judgment; and

3.     Why has it not been previously obtained.

41.     And the Court continues:

> if a party opposing summary judgment files an affidavit under Rule 56D, that specifically addresses these requirements, a continuance of a motion for summary judgment for purposes of discovery should be granted as a matter of course.

42.     The Plaintiff (we) have been trying to obtain the:

a.     Checkbook for the Trust for over 3 years;

b.     The hard drive for the Trust computer for over 3 years; and

c.     The legitimate back up for the $22,000 in checks Matt Durst wrote to himself out of the Trust checkbook, endorsed same and deposited in his personal account.

43.     We have not obtained any of the above because Matt Durst has refused to turn them over despite stating they had done so.

44.     October 13, 2011 email from me to Kelly Peck regarding checkbook. November 28, 2011 letter form Ms. Peck to Probate Court. Judge Becker Page 4, Paragraph 2.

> On October 17, 2011 Matt forwarded the checkbook for that account to Mike.

June 6, 2012 Civil Action US District Court Pg. 5, Paragraph 29, 30.

45.     I do not think it stretches the imagination to conclude that there is damaging evidence in the contents of the hard drive and the check register, or we would have received them.  This evidence is not in our knowledge and control, but that of Defendant's Matt Durst, Kelley Peck and Robinson & Cole.  The Court should note Peck's March 22, 2012 letter to Trust attorney Piscatelli, offering to give back the Trust

money.  If it will allow finalization of the accounting, her final effort at extortion before the money was ordered returned to the Trust, not to escrow by order.

46.    Finally, the court on Page 18 of its January 13, 2015 opinion states:

> The Court rejects Plaintiff's belated argument to the extent that it relies on allegations outside of the pleadings without any evidentiary support.

47.    The evidence is solely in the hands of Matt Durst who has for 3 years refused to supply the proofs that he used his own funds for various expenses ($22,000+/-) that he repaid to himself out of Trust funds.  If Matt Durst cannot display proof of his funds being used for the $22,000.00 in expenses then it is clear, he misappropriated Trust money.  He has been asked for that proof repeatedly over the past 3 years.

48.    The information sought (and not provided) for 3 years as demonstrated by at least 6 exhibits would prelcude summary judgment because it will clearly demonstrate the Defendant Matthew Durst is hiding evidence and is doing so upon the advice and with the knowledge of Robinson & Cole attorney Peck.

49.    What we seek is:

1.    The checkbook used for Trust business with all registers;

2.    The hard drive from the Trust computer;

3.    The hard, specific evidence that Matt Durst used his own money to justify him reimbursing himself out of Trust funds.

50.    We have presented herein numerous documents authored by either Matt Durst or Kelley Peck asserting that they have turned over the checkbook (the Trust's).  Then on February 12, 2012, Peck issues the ultimate insult to everyone associated with

this case.  "Matt did not keep a check register, his month to month records were discarded as soon as the statements were received and verified each month." "He kept electronic access to account information."

51.    But we still do not have the hard drive.

52.    This outright lie by Peck follows statements by Peck (in writing) that they had forwarded the checkbook to Mike Durst.  Those written statements (all attached) were made on October 17, 2011, November 7, 2011, November 28, 2011 and January 8, 2012 in letters to Robinson & Cole letterhead.

53.    We ask the Court to note the Probate Court's Order of April 3, 2013 (Exhibit "I") Schedule A-1 Page 3:

> The Court finds that the amounts $35,000 placed in escrow with the firm of Robinson & Cole by the Trustee are owned by the Trust.

These funds were not placed in Robinson & Cole's escrow by the Court Order, they were ordered frozen there at my request after being misappropriated by Matthew Durst upon the advice (of Robinson & Cole attorney Kelley Peck) to "revise his strategy".

54.    The Defendant Robinson & Cole raised defenses to several elements of their involvement in the case which we will deal with in specificity in this motion. Robinson & Cole primarily based its motion on the premise that most of the allegations and supporting evidence involved matters that (in time) preceded Robinson & Cole's involvement with the Trust, the Trustee and related matters in this litigation.

55.    The recent depositions of Peck and Matthew Durst, however, have cast a great deal of light on these and other matters this that will undermine that position.

56.    There was no Probate Court order whereby Robinson & Cole and/or Peck were ordered or granted permission to take the $35,000 of Trust's money. There is, however, an order requested by Plaintiff's freezing the money to preclude Robinson & Cole from paying itself over ($28,000) in hastily concocted bills and depleting the Trust of its funds.

57.    There is an Order from the Connecticut Court dated May 24, 2013 (Exhibit "I") rejecting Robinson & Cole's legal bill to the tune of 97% and ordering the funds returned to the Trust net of $300 paid to an accountant and $1,000 paid to Plaintiff (Trustee) Dr. Mike Durst for travel expenses.

58.    It should be noted that Peck stated in her deposition on April 28, 2015, (76 at 18-23) (Exhibit "J"):

Q.    Do you recall using the expression "revise my strategy" or words to that effect?

A.    No I didn't use that expression,

(76 at 20-22) (Exhibit "J")

59.    Also see Kelley Peck deposition (76 at 28; 77 at 1) (Exhibit "J")

Q.    Did you indicate that you would advise Matt to revise his strategy?

A.    You know, I don't think I ever used the term revised strategy in any context

60.    Additionally, Exhibit "J" completely refutes Peck's statements. No where in that original plan was there an objection built into it.

(77 at 10-11) (Exhibit "J")

61.     One only has to view Peck's own letter of October 13, 2011 (Exhibit "K") to determine this statement is an outright lie. "At any time any of the beneficiaries can appear in Court and post objections."

62.     Clearly Peck attempted to utilize the return of the Trust's $35,000 to extort compliance with the soon to be exposed bogus accounting she did and submitted to the Probate Court. Peck admitted that she, not Matt Durst did the accounting submitted to Probate Court. (See Exhibit "L").

63.     In her deposition of April 28, 2015 (Exhibit "M"), (17 at 17), Peck was asked:

Q.     What were the nature of those conversations? (with Steve Durst)

A.     Discussions regarding his goals and objectives with respect to his family  and his taxes and the Trust and his estate planning in general.

A.     I prepared a will (for Steve Durst)

In short, Peck was my estate planning attorney with fiduciary duties to me.

Q.     Did you prepare Document marked DMD-16 – the final accounting (for Probate Court).

A.     Yes

64.     In that final accounting Peck did the following:

a.     Charged a total of $45,000 of summer seashore vacations over three years solely to me as note reductions . In reality Defendant Matt Durst's wife and 3 sons attended as did Dr. Mike Durst and his daughters and a guest.

b.     Charged $180,000 in legal fees paid by the Trust to attorney Fred Santarelli of Elliott Greenfield as note reductions payments as thought the wrongful termination litigation had nothing to do with the Goodman litigation concerning the

Trust's 10% interest in the shopping center known as Goodmill LLC.

c.   Failed to include the accrued interest due me of over $74,000 (as of October 2011)

65.   The bogus accounting (if properly done) raises the amount still due (from Matt Durst-Trustee) to well over $250,000, a strong motive to induce Matt Durst as Trustee not to pursue litigation against the appraiser Parker Benjamin for their negligence since if Parker Benjamin was guilty of missing 7:04, so was Peck.

66.   In addition to the breaches of fiduciary duty, all of which occurred in 2011 while employed at Robinson & Cole, Peck and Robinson & Cole engaged in a complete cover up in summer of 2011 in their outright lies regarding failure to sue appraiser Parker Benjamin (the firm) and Paul Ruby (the individual appraiser) for negligently missing clause 7:04 in the Goodmill Operating Agreement when he (Ruby) performed the appraisal in 2007. This clause had the possibility of rendering the Trust's 10% interest in the shopping center worthless.  See Peck letter to Probate Court dated November 28, 2011.  (Exhibit "G")

67.   The reason given by Robinson & Cole and Ed Heath (litigation attorney utilized in Peck's firm) for not filing suit against the appraiser was that the appraisal was not done until May 2008 and therefore they could not be culpable as the conversion of the Trust to irrevocable and the attendant note, collateral agreement and indemnification all took place December 21, 2007 predating the appraisal, according to (Exhibit "D") Ed Heath, Peck and Yacovelle concurring.  Therefore, the appraisal could not have been instrumental in the process.

68.    Problem is, it's all a big lie to protect Peck, Robinson & Cole and Matthew Durst. If the appraiser was negligent for missing 7:04, how could the aforementioned trio not likewise be negligent?  So, when did we, Peck, Robinson & Cole, Matthew Durst, really have the appraised value from Parker Benjamin?

69.    In Kelly Peck's deposition (42 at 17-20 (Exhibit "N"):

A.    I believe your question is whether I had the information that the value was 841 ($841,000) at around the time when it was executed (the documents converting the JBT to irrevocable) and the answer to that question is yes.

70.    Also consider 52 at 7-8 (Exhibit "O"):

At the time the Trust became irrevocable in December 2007 the interest was valued at $841,000.

(See Email from Peck to Matt Durst (Exhibit "A") dated October 25, 2007.

71.    Kelley Peck spoke to Paul Ruby and he is willing to do the appraisal and will have it for us in about 2 weeks from October 25, 2007.

72.    Consider the message forwarded from John Yacovelle to Matt Durst dated June 18, 2011 (Exhibit "D") which provides, in pertinent part:

As we already know, Ruby had before him the Operating Agreement [Union Mill Center], from which he quoted on page 4 of the appraisal.  He did not, however, note the existence of paragraph 7:04 which could have rendered the interest worthless for some years into the future.

73.    In the same email (Exhibit "D") Mr. Yacovelle goes on to say:

...the agreement was finalized in December 2007, several months before the draft appraisal let alone the final appraisal. Therefore, you could not have relied on the appraisal valuation of $841K in the agreement with Steve.

Per Yacovelle's efforts to perpetrate the cover-up which Peck and her coworker Heath knew were untrue. For whatever its worth, Peck finally told the truth under oath in her April 28, 2015 deposition.

74.    Peck testified several times during the deposition that she had the appraisal, Goodmill Operating Agreement and all necessary documents and information to settle prior to December 31, 2007.

75.    Peck further admitted she never discussed clause 7:04 with Matt or me in any fashion clearly underscoring her negligence.

(50 at 3-10) (Exhibit "P").

76.    Peck also admitted repeatedly in the April 28 deposition that without the 7:04 triggered termination (of me) as an employee at Goodman Properties – there would be no litigation. Accordingly, her treatment of the $180,000 paid to Attorney Santarelli to fight the termination as note reductions to me are another example of her disregard for reality and truth. Yacovelle's Motion for Declaratory Judgment finds the complaint focused on clause 7:04 and the consequences of the termination to the Trust namely loss of its main asset, made attorney Santorelli's fight against the termination an integral part of the entire case.

77.    Finally, one only has to read the last sentence of Yacovelle's deposition of Bruce Goodman:

> What I (Yacovelle) think truthfully is Steven Durst has everything to do with it (the case)

(Deposition of Bruce Goodman, 128 at 1-2) (Exhibit "Q")

78.    It is clear through Peck's testimony in her April 28, 2015 deposition that she never once discussed the impact or existence of clause 7:04 in the Goodmill Operating Agreement with either Matt Durst or me.

79.    It is clear Peck lied in her deposition as to whether she threatened to direct Matt to revise her strategy – which led to the illicit taking of the Trust's $35,000.

80.    It is undisputed that Peck, Yacovelle and Robinson & Cole were directed to file suit against the appraiser for missing 7:04 in his valuing the Trust's Goodmill asset, over 4 years ago.

81.    It is clear Peck hid the truth when her coworker Ed Heath (a litigator) concluded the appraiser could not be the proximate cause of damages to the Trust because the appraisal was not done until May 2008. Yet Peck has testified, under oath, in her deposition repeatedly that she had the appraisal in late 2007 and utilized it in her work converting the Trust to irrevocable status. Peck sold out her client to protect her own selfish interest for the same reason the appraiser is negligent, she missed 7:04.

82.    Having admitted in her deposition that she agreed that 7:04 was a primary cause of the ongoing litigation (my termination leading to its implementation) Peck took the position that legal fees ($140,000 - $200,000) spent to fight the illegal termination should be treated as note reductions to me. Peck admitted in her deposition that she authored the accounting – not Matt Durst as previously stated by her.

83.    Peck failed to provide to me the 2011 Grantor's depreciation on Goodmill; an intentional oversight of $160,000 and a serious breech of her fiduciary duty.

84.     For the above reasons and the facts and proofs that accompanied them, I respectfully request the decision to allow Robinson & Cole to be released as a defendant in this litigation – be reconsidered and reversed.

## THE MOTION TO RECONSIDER REGARDING THE JOINING OF JOHN YACOVELLE AS A DEFENDANT AND THE PARTIAL SUMMARY JUDGMENT IN FAVOR OF MATTHEW DURST

85.     With regard to the Motion for for Partial Summary Judgment in favor of Matthew Durst, this Motion to Reconsider is more akin to a motion to clarify for the reasons set forth below.

## FACTUAL BACKGROUND:  PARTIAL SUMMARY JUDGMENT IN FAVOR OF MATTHEW DURST AND ASSERTION OF THE CLAIM AGAINST JOHN YACOVELLE, ESQUIRE

86.     Based on the facts and circumstances uncovered in the discovery and other depositions, I am also seeking the Court's reconsideration of the Partial Summary Judgment in favor of Matthew Durst and the denial of my motion to amend the Complaint to include John Yacovelle.

87.     That discovery has exposed Mr. Yacovelle's malpractice for a multitude of breaches of fiduciary duty and then ultimately repeatedly lying throughout this case and endeavoring to cover up the lies by doubling down with repeated false statements.

88.     The proofs set forth below will not be of the "he said she said" variety but a litany of lies and misstatements that have now been dragged out into the light of day by the recently concluded depositions of Matthew Durst and Kelley Peck.

89.     In December 2007 the Trust was involved in the Superior Court litigation being handled by Mr. Yacovelle.  While the case was brought by Trust Trustee Matt, I was the undisputed centerpiece of the litigation.  I was privy to all of the relevant facts

and circumstances needed to prevail in that case. As such, I was regularly and consistently consulted by Matt and Mr. Yacovelle during the pendency of that litigation.

90.    Like anyone else involved in litigation, it was my goal to settle the Trust dispute with Bruce Goodman. Goodman was well represented, is exceptionally bright and extremely wealthy; a formidable array.

91.    Accordingly in 2011, I was able to:

1.    Settle my own litigation with Goodman; and

2.    Elicit from him a significant reversal in his position on clause 7:04 in the Goodmill Operating Agreement that would have allowed the Trust to maintain its 10% ownership in the Union Lake Crossing Shopping Center and pay off any deficiency emanating from the sale of the 1600 building in Philadelphia that Goodman held a mortgage on by applying our share of distributions from the center's cash flow.

92.    Furthermore, the Trust would have been accruing 10% interest of the Three Million Dollars ($3,000,000.00) in principal debt being amortized each year; enough to pay off the deficiency in 1-2 years (even by Goodman's inflated standards).

93.    By now the deficiency on the 1600 Building would have been paid in full and the Trust's equity would have increased by $3,541,000.00 (the $841,000.00 at inception and 9 years added at $300,000.00 per year.) This deal was negotiated by Bruce Goodman and me simultaneously with our settlement and memorialized on May 19, 2011.

94.    Additional documents memorializing this understanding were prepared by Bruce Goodman's attorneys and transmitted to my brother, Trustee Matthew Durst. (See Exhibits "R" and "S")

95.   Mr. Yacovelle, however, unilaterally decided to reject that offer without any consultation or advice with me, Mike or Matt.  As stated by Mr. Yacovelle in his own words:

> …I have rejected the Hladik proposal that we simply modify the termination buyout (maybe a little tweaking of the cap rate, etc., and kick it down the road for up to ten years.

(See Exhibit "D", page 2, para. 2)

96.   Mr. Yacovelle's unilateral decision resulted in over $500,000.00 in legal fees to correct his malpractice.

97.   In addition, Mr. Yacovelle's unilateral decision cost this Trust approximately Four Million Dollars ($4,000,000.00) in income.

98.   Mr. Yacovelle, in rejecting the proposal without consultation or advice with his client or myself, was done despite his admitted lack of expertise in issues of valuation.  This is more particularly set forth in Exhibit "T".

99.   But the real reason became evident during the recent depositions as follows.  It is freely acknowledged by Yacovelle, Peck and Matt Durst that in the summer of 2011, once I had the first two legs of the case resolved I sought the third and final leg. I directed Matt and Yacovelle to pursue litigation against Parker Benjamin for missing the existence of clause 7:04 in the Goodmill Operating Agreement which gave Goodman the right to buy the Trust's interest in the shopping center at a cap rate – that rendered our interest valueless. In a Letter Brief to Judge McDonnell, Yacovelle states:

At the repeated insistence and demand of Steve Durst, Matt (and I) explored the feasibility of a malpractice suit against the appraiser. He had obviously been negligent, since the appraisal indicated that he had seen the Operating Agreement, but nowhere did he flag Section 7:04 and either attempt to explain it away, or discount his appraisal because of it. He simply missed it or ignored it.

(See Exhibit "U")

100.   Yacovelle goes on to say in Exhibit "U":

Connecticut trial counsel, however, pointed out that no damages had been proximately caused by the negligence, because the appraisal was issued after the Operating Agreement had been signed (Nov. 2005) and _after_ the Trust had issued a $500,000 note to Steve on December 24, 2007, (based on Steve's $600,000 valuation) and the appraisal influenced neither action because it did not yet exist. (JAYCert par. 10) The suit, therefore, was not filed…

101.   Unfortunately for Yacovelle, Peck testified repeatedly in her recent deposition that she had the appraisal (the $841,000.00 value) at the time (or prior to) the conversion of the revocable Trust to irrevocable on December 24, 2007.

Peck to Mr. D'Elia

I believe - your question is whether I had the information that the value was 841 at around the time when it was executed, and the answer to that question is yes.

(See Exhibit "N")

102.   In an email from Kelley Peck to Matt Durst dated October 25, 2007 (Exhibit "A"), Peck stated:

Matt, I have witnesses if we need them for Saturday morning. However, I want to explore the possibility of delaying the signing until we receive the appraisal. I spoke to Paul Ruby and he is willing to do the appraisal and will have it for us in about 2 weeks.

103.   In an email from Matt Durst to Peck sent December 19, 2007 (Exhibit "V"):

I want to review the purpose of the meeting on Friday, 12.21/2007. 1. I want to review the re-assessment that Paul Ruby has completed for the Goodmill Shopping Center and sign the documents converting the JB Revocable Trust to an Irrevocable status as we had discussed…

104.   In an email from Peck to Matt Durst dated October 25, 2007 (Exhibit "A"), Peck said:

This is the last document that will need to be reviewed. It makes the LLC interest the collateral for the promissory note in case the trust defaults on a loan payment.

105.   Exhibit "L" is page 13 of the Trust accounting filed with Connecticut Probate Court in November 28, 2011 showing the appraiser paid in full on October 31, 2011.

106.   So, we have all sorts of exhibits and statements proving the appraisal was done and in Peck's hands in October or November 2007 in time for the December 24, 2007 closing converting the Trust from revocable to irrevocable. And we have no less a figure than Yacovelle himself declaring that Parker Benjamin had missed 7:04 and it's possible deleterious effect on the Trust and the value of its asset (the 10% interest in the Center). And we have admissions from Peck and Yacovelle that I wanted the appraiser sued for his well-recognized negligence.

107.   So why was there no suit instituted against the Parker Benjamin? The answer is obvious and has now been exposed in the depositions and other discovery. A lawsuit against Parker Benjamin would clearly have resulted in a cross claim against Peck and Robinson & Cole. If Parker Benjamin was negligent for missing section 7.04, then clearly Peck was also negligent.

108.   Peck Deposition (50 at 1-2) (Exhibit "P"):

...did you advise Matt Durst at all about 7:04?

A.     I did not have a discussion with him about section 7:04 of the Operating Agreement."

Q.     How about Steve Durst

A.     I did not have a discussion with Steve either.

109.   So, Peck knew she missed 7:04 as did all of us, Matt, me and Yacovelle. Why didn't Peck and/or Yacovelle sue Parker Benjamin?  Because everyone realized he would cross claim Peck and her law firm.

110.   Hence, the big lie.  Peck asks Heath, a litigator at Robinson & Cole, for a report on the viability of a suit against the appraiser.  Despite all of them knowing the appraisal was done and in Peck's hands in late 2007, a cover-up was concocted relying on the May 2008 final draft as a means of side stepping a suit against Parker Benjamin. As we now know, however, it was a cover-up per the evidence herein and Peck's own testimony under oath.

111.   So, the last piece of what would have been a vastly superior situation for the Trust was killed by Yacovelle ignoring and unilaterally rejecting Goodman's May 19, 2011 offer and the ability to wipe out any deficiency on the 1600 building mortgage and amass $300,000.00 a year ($2,700,000.00 by now) in equity by painless amortization and end the litigation.

112.   Matt Durst sent Yacovelle the email marked as Exhibit "W" clearly prioritizing his own issues.

...the Trusts ability to satisfies Steve's request in a legal/practical manner without placing me @ risk personally in any manner whatsoever.

113.    Of particular note is the bill to the Trust (Exhibit "X") for Robinson & Cole's services in May, June and July 2011 and the number of line items dealing with the idea of suing the appraiser. We know Robinson & Cole and its attorneys Peck and Heath concluded one could not sue Parker Benjamin because the appraisal was done after the December 24, 2007 settlement and issuance of the note relying on the appraisal. We know Yacovelle ardently agreed there was no proximate cause against the appraiser for that reason.

114.   As a further example of how far Yacovelle was willing to go to push this bogus position on the Court, we submit the relevant pages of Yacovelle's Supplemental Brief to the Court accusing either Vincent D'Elia, Esquire or me of altering the value of the note used in the closing from $600,000.00 to $841,000.00.  Yacovelle does not explain how no one else but he noticed this over a four year period in which it existed. He does not explain how we guessed the value of $841,000.00 and were simply fortunate the actual appraisal (alleged to have been done six months later) was exactly the same amount.

115.   Rather than (Exhibit "Y") further speculate on Yacovelle's arrogant and untruthful efforts to sustain the Robinson & Cole position to lie, to cover-up that lie, and not to sue Parker Benjamin fearing the inevitable cross claim, we will simply rely on Peck's truthful testimony during her deposition and (Exhibit "W") showing who made the changes, namely Peck herself.

116.   Is there a reason for experienced attorneys to lie then compound the lie by covering it up?  With my personal litigation with Goodman settled; with the May 19, 2011 offer by Goodman presenting a viable and very beneficial opportunity for the Trust

(and ending expensive and contentious litigation), Matt Durst and Kelley Peck had an unholy alliance by virtue of language in the irrevocable version of the Trust which gave Matt a stranglehold on the Trust's finances and prevented me or my beneficiaries from replacing him or doing anything about it except for the scenario we have before us; willful misconduct, because Matt Durst above all did not want to sue Peck, or by suing the Parker Benjamin, cause her to be sued.

117.   So Matt Durst despite knowing the truth went along with the cover-up to safeguard Peck, Robinson & Cole and his own control of the Trust.  I'm almost twenty years older than Matt.  One day, after my passing, the shopping center would be fully paid off and Matt Durst in control of $750,000.00 to $1,000,000.00 of income per year. In return for crafting this B movie perhaps Peck would be granted a fee of $100,000.00 per year to look after things. A nice annuity.

118.   In addition to all of the above, Yacovelle compounded his litany of misdeeds by virtue of the following actions or omissions. We were castigated for failing to provide a new MAI appraisal on the 1600 building (where BG held a 900,000 mortgage) to assist the Court in determining value. Keeping in mind Yacovelle is a fiduciary to the Trust (as is Matt Durst) did he not have a responsibility to order an appraisal? The better the appraisal the lower the alleged deficiency so there can be no doubt it was an item the trust should have prioritized. How did Yacovelle fulfill his fiduciary duties? Please read Yacovelle's email to his (supposed) adversaries (Goodman's attorneys) (Exhibit "Z")

> I have an MAI sniffing around 1600 and am pleased to learn preliminarily that it ain't worth crap.

119.   Considering that the lower the value of 1600, the worse it is for the Trust *vis a vis* any deficiency, is there any question as to how honestly Yacovelle was representing the client who paid him $90,000.00 in the period of one year?

120.   Finally, the Court has in its opinion and order precluded us from arguing whether the value placed on the 1600 building as an element of the settlement (was fair) that Matt Durst and Yacovelle reached with Goodman.

121.   Yacovelle has admitted he killed a deal worth at least 3.5 Million Dollars to the Trust (Goodman's May 19, 2011 offer) that was by any logic vastly superior to that which he crafted in October 2011. The concept of fair and unfair is highly subjective. If I inherited a piece of ground from my parents – my cost being zero and I received a Two Million Dollar offer for it in a week, many might say that was fair.  If however, I had received an offer of Five Million Dollars for the asset, under equal or better or better conditions, then if I were a fiduciary, or logical, or honest, or all three, there is no question what I would do.

122.   But we now know Matt Durst and Yacovelle had other motives than the best interest of the trust and its beneficiaries, namely cover Matt Durst and Peck's exposed derrieres for failing to pursue the appraiser, and ultimately Peck and her law firms.

123.   Both Matt Durst and Yacovelle lacked sufficient expertise in the various aspects of commercial real estate. Both repeatedly acknowledged this in various writings throughout the case. Matt Durst acknowledged in his testimony under oath during his deposition that he had no background or education in real estate matters. Yet both he and Yacovelle want this Court to believe that he had the authority to do

anything he wanted – and in particular liquidate the trust's keystone asset – the 10% interest in Union Lake Crossing, as well as the trust's 20% interest in the Reserve (29 acres of commercial land). That 20% interest alone was jointly valued by BG's right hand man Chris Anderson and me at $245,000.

124.   Matt Durst asserts his authority to liquidate the trust and/or its key assets emanates from the December 29, 2006 letter attached as Exhibit "AA". This letter was crafted at the time the trust was revocable and I had 100% control and authority.   To assume that when this letter was crafted that it meant Matt (or Mike) could do anything they chose is ludicrous. If Peck had meant it to be unlimited authority, it would not have contained the following language:

> Also, if there are matters outside the scope of this delegations that require my attention or approval, please advise me accordingly.

125.   When Matt Durst received Co-Trustee Mike's written objections to the October 2011 settlement, Matt ignored it and proceeded to settle the case on terms enormously deficient to that which he and Yacovelle had passed up. Matt Durst alleges that his authority came from the letter delegating "ministerial" duties to him.

126.   This delegation of authority (limited as it was) was a reference to the Revocable Trust dated May 10, 2007.   There is no document of any sort nor is there any contention that Co-Trustee Mike Durst or I extending that delegation to the Irrevocable Trust dated December 24, 2007.

127.   There is no better indication of whether Matt Durst was intended by me to be given the scope of authority that would have him analyzing, valuing, negotiating and consummating a deal on a 10% interest in an $85,000,000.00 center (cost) then

appraised at 94.5 million. The best indication of how ridiculous such authority would have been is Matt's deposition on April 28, 2015 (Exhibit "BB").

> A.    ...I don't understand cap rate...

(Deposition of Matt Durst 145 at 22-23)

> Q.    And do you have any training, formal training in financial matters?
>
> A.    No.

(Matt Durst 146 at 22-24)

> Q.    Do you have any training in real estate matters?
>
> A.    He's [Steven Durst] the expert. I'm not the expert. The answer is no.

(Matt Durst 146 at 25; 147 at 1-3)

> Q.    Okay.   Do you have any experience with appraisals?
>
> A.    No.

(Matt Durst 147 at 11-13)

> Q.    ...Do you know the criteria that's used by an appraiser to value real estate?
>
> A.    No.
>
> Q.    Do you know how to evaluate the value of a commercial property?
>
> A.    No.

(Matt Durst 148 at 4-9)

128.    That is why Matt's ministerial authority did not extend to something as involved as the disposition of commercial real estate worth Three to Four Million Dollars if you knew how to value it.

129.    While this Certification is replete with specific actions taken by or caused by Yacovelle it is the cover-up regarding Parker Benjamin that is most troubling and the subsequent efforts by Yacovelle to smear Mr. D'Elia and myself for altering the value on the note when he knew that was the value reached by Parker Benjamin.

130.    In this Court's August 5, 2013 Opinion, partial summary judgment was granted to Defendant Matthew Durst.  The basis for this Opinion was the Court's finding that the settlement that was reached in the Superior Court matter was not subject to attack because it was precluded by the Doctrine of Collateral Estoppel.

131.    It is important to note, however, that on Page 9 of the Opinion there is the following language:

> Further, Defendant maintains that he is not seeking to preclude Plaintiffs from arguing their willful misconduct, breach of fiduciary duty claims or from arguing whether Defendant had authority to enter into the settlement agreement.

132.    This highlights the critical issue in this case.  Did Defendant Matthew Durst (and his attorney John Yacovelle) exceed their authority in entering into the Superior Court settlement?  And if they did exceed that authority, then what is my remedy?

133.    There is no dispute that the Trust document required the consent of Matt and Mike in order to take action on Trust business.  It is further undisputed that while the Trust was revocable, Matt Durst was given the authority to make ministerial

decisions on his own and without consultation with Co-Trustee Mike. Decisions other than ministerial in nature need to be consented to by both Trustees.

134. One of the reasons for this ministerial delegation to Matt, was the fact that the Trust was revocable thereby giving me full control and authority to overrule decisions made by Matt.

135. But when the Trust was converted to Irrevocable, I no longer had that power. Matt, however, continued to treat the Trust as if it was his own and without regard to consultation with Mike. This is clear evidence that Matt exceeded his authority as a Trustee.

136. More importantly, Matt enters into the settlement wherein he conveys the Trust's most significant and valued asset (the 10% interest in Union Mill Shopping Center) despite the fact that he knows it is encumbered by my $500,000.00 Note. Matt further enters into the settlement without consultation with Co-Trustee Mike and without consultation with me as Grantor/Trustee

137. This clear violation of his fiduciary responsibilities cannot go unaddressed. It was clear that he exceeded his authority by entering into the settlement. If that is true then there must be a remedy for that wrongdoing.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: August 7, 2015

_Steven Durst_
Steven Durst

F:\FILES\7933 (Steve Durst v. Matthew Durst (District Court Case)\Pleadings\certification of steven durst in support of motion to reconsider version 3.doc